Nichols v. Wells.

---

JUNE 9, 1803.

Ky. Sneed.
1kd255
97 641

# John Nichols *et al.* *v.* Samuel Wells.

*Upon an appeal from a decree of the Washington District Court.*

1. Where the enacting clause of a statute is ambiguous, recourse may be had to the preamble, and to contemporaneous exposition in aid of its construction.

2. The most natural and appropriate way of construing a statute is to con-
strue one part by another, and, if possible, to give effect to each clause, sen-
tence and word in the act.

3. How a certain entry should be surveyed.

The appellants claim, under an entry for 800 acres of land, made
in the name of William McConnell, the 18th day of May, 1780, on a
common treasury warrant, and the appellee claims under a certifi-
cate of pre-emption for one thousand acres of land, granted to him
as heir-at-law of Samuel Wells, deceased, by the county court of
Bourbon, on the — day of September, 1786.

The principal point to be settled in this suit is, did the land law
authorize the county court of Bourbon to grant Wells a certificate
for a pre-emption right, which would be paramount to the right
previously acquired by McConnell's entry to part of the same
land?

It may be admitted that Wells' ancestor might justly have
obtained from the commissioners a certificate of pre-emption for
the land in contest; but it must also be admitted that the oppor-
tunity and privilege of making application for it expired with the
26th day of April, 1780; and as the land law then stood, his right
became dormant, if not forfeited. Therefore, the decision of this
question depends on the third section of an act which passed after-
ward at the May session, 1781, entitled "an act to amend the act
for adjusting and settling the titles of claimers to unpatented lands
under the present and former government, previous to the estab-
lishment of the commonwealth's land office," which section is in
the following words: "And whereas, the commissioners appointed
for the purpose of carrying into execution the before-recited act,
were discontinued in the district of Kentucky, whereby many
good people in this commonwealth were prevented from proving
their rights of settlement and pre-emption in due time, owing to
their being engaged in the public service of their country. Be it
therefore enacted, that the county courts within which such lands
may lie, are hereby empowered and required to · hear and deter-
mine such disputes as have not heretofore been determined by
commissioners acting in that country under the act of assembly,
taking for their guide and direction the acts of assembly whereby
the commissioners were governed; and the register of the land
office is hereby empowered and required to grant titles on the
determination of such courts, in the same manner as if the com-
missioners had determined the same."

Nichols *v.* Wells.

This section contains only two clauses which are necessary to be considered; the first is a recital resembling the preamble of an act; the other is an enacting clause, in the construction of which, must they be considered together, or can the enacting clause stand alone and receive a rational exposition without a reference to the recital? It is conceived that they must be considered together; for without a reference to the recital, it can not be ascertained what *county courts,* what *lands,* what *claimants,* nor what *disputes* were intended by the legislature; and with such reference the whole may be clearly ascertained. The words, "the county courts," relate to the county courts of the district of Kentucky; "such lands," to lands which might be claimed in right of settlement and pre-emption within the said district; "the claimants" to the good people of Virginia, who were prevented in proving their rights in due time, owing to their being engaged in the public service of that country; the "disputes," such as might exist between two persons of the above description, who claimed the same land, or between a claimant and the commonwealth; the word "disputes," although it literally means contests between parties who are opponents in courts of justice; yet it is believed that if the county courts, as commissioners, were authorized to determine disputes concerning claims to land of any kind, they were by the word, as here used, authorized to determine all claims of the same kind, where no contests might happen; and in every such case it is presumed proper to consider the commonwealth as a party in opposition to the claimant. Thus, then, "the courts" —"the lands"—"the claimants" and "disputes," are satisfactorily identified; nor can the section be farther extended.

But it is argued that a preamble can not limit or extend the enacting clause of a statute. In the general this is true where the enacting clause is expressly more or less extensive than the preamble; but in some instances the preamble must from necessity be used as a clue to find the intention of the legislature. Where the enacting clause of an act is ambiguous, the preamble may be used to explain it; and to give the section under consideration any possible effect, recourse must be had to its preamble. Strike out the expressions in the preamble of the section which relate to the inhabitants of Virginia, and their being employed in her public service, and then the enacting clause, aided by the remainder of the preamble, would have vested the county courts in the dis-

17

trict of Kentucky with powers as to the description of claimants, co-extensive with those given to the commissioners; but this would be equally arbitrary as to expunge any *other part* of the preamble; nor is it to be presumed that these expressions were used and inserted without an intention that they should have their appropriate meaning." This court is further convinced of the propriety of the construction of the section under consideration, which it has embraced by adverting to an act of the October session, 1779, entitled "an act for giving further time to officers and soldiers to ascertain their claims to lands." The provisions of this act extend *only* to *officers* and *soldiers* of the *Virginia line, then in the continental army;* when at the same time there were many citizens of Virginia in its immediate public service who equally merited the benefits as those who by that act were to enjoy them; viz: the officers and soldiers of the State line and navy. The benefits provided or granted by the act of October, 1779, did not extend to the citizens of sister States, who were in the continental army or otherwise engaged in the public service of the confederation, nor in that of any of the States but Virginia; therefore it can not be rationally presumed that the same legislature which in 1779 excluded from the benefits and privileges then granted such a variety of public servants, from whose exertions they might either mediately or immediately have derived great advantages, could intend in 1781 to confer similar benefits and privileges on all claimants to settlements and pre-emption rights, to whatever country they might belong, or however unworthy they were of the indulgence; and at the same time use expressions in the preamble which show that they had not repented of what may be considered by some their former rigid and unjust policy. And here it may be remarked that the judge of the inferior court was evidently mistaken when he assumed as a position that "it must be well understood that the claims of the officers and soldiers were unquestionably secured by and under the act of October, 1779," if he meant that the claims of officers and soldiers, other than those of the Virginia line then in the continental army, were included; for abundant instances may be produced from the laws of Virginia, where the distinction is taken and kept up as to provisions for the officers and soldiers of the Virginia line on continental establishment and the officers and soldiers of the Virginia line on state establishment. It may be further observed that the construction now adopted by this court was generally, nay, almost universally, pursued by the

county courts in the district of Kentucky, for several years after the passage of this act; for until the fall of the year 1785, it was expressed in the face of every certificate granted by them, a few instances only excepted, that the claimant had been prevented from proving his claim before the commissioners, owing to his being detained in the public service. Therefore, with propriety, may be applied the maxim, "*Contemporanea expositio est fortissima in lege.*" It is contended that the words, "are hereby empowered and required to hear and determine such disputes as have not heretofore been determined by commissioners acting in that country," are large and extensive, and will embrace every case not decided on by the commissioners. To select these particular words would be dismembering and garbling the section, and would not be construing it upon due consideration of all its parts —would produce a repugnance to some and destroy the obvious meaning of other parts, which is contrary to the settled rules of construction, that the most natural and genuine way of construing a statute is to construe one part by another part of the same statute; that the words and meaning of one part of a statute do frequently lead to the sense of another; and if it can be prevented, no *clause, sentence* or *word* shall be superfluous, void or insignificant; and these rules of construction apply with peculiar force by adverting that the two clauses are parts of the *same section*, inseparably connected with and necessarily dependant on each other. It is further contended that the construction of this statute should be taken largely, and by equity extended so as to embrace all cases within the mischief which it was intended to remedy; that the case of the *captive, infant, feme covert* and persons *non compos mentis*, ought to have been provided for. If the members of this court had been in the legislature when the law was on its passage, their humanity and justice might have induced them to have provided for those cases; but in their judicial capacity they are bound by settled rules of construction, and it is their duty to declare what the law is and not what it should have been. One of which rules is, "that a statute shall not be expounded largely or by equity to overthrow an estate." McConnell was vested with an equitable estate in this land from the 18th day of May, 1780, at which time he was authorized by law to locate his warrant on this land. The counsel for the appellants have denied the power of the legislature to destroy a vested right; and that the appellee's certificate does not contain what is essential to give it validity. One or both of

these points might have required particular attention, had the section of the law relied on been clearly in favor of the appellee. But from the view the court has taken of that section, and it not being expressed in Wells' certificate, nor otherwise appearing, that his ancestor resided in the State of Virginia, and was employed in her public service at the time of the sitting of the commissioners in the district of Kentucky, the only decision it need now make is, that Wells' case is not comprehended therein, or at least that any construction in his favor which can be given it is too doubtful to destroy the right acquired under McConnell's entry, which was made many years before Wells obtained his certificate, and therefore the decree in his favor is erroneous. But although the claim of the appellee ought not to deprive the appellants of the right which was vested in them by McConnell's entry, made previous to the date of the certificate in question; yet, as the certificate was granted by the county court, and the commonwealth has received the purchase money from him, it seems to the court that his claim is valid, as to so much of the land as was not appropriated at the time he obtained the certificate. And this consideration makes it necessary to determine how the entry under which the appellants claim should have been surveyed. The entry is as followeth:

"May 18, 1780. William McConnell enters 800 acres on treasury warrant, beginning about half a mile below the mouth of Mill creek, on the east fork of Licking, to include the forks thereof, and to run up both sides of both creeks for quantity."

And it seems to the court, that the survey made on McConnell's entry should have been as near a square as the calls of the entry would permit, commencing in the middle of the north fork of Licking, one half mile on a direct course below the mouth of Mill creek, so that the line passing through that point would have extended the same distance therefrom each way, and the survey have included the junction of those water courses as nearly at equal distances from the lines, run at right angles to the first line, as that those lines in their whole extent would have included both those water courses: that is to say, both the water courses should so have crossed the upper line of the survey as that their junction would have been as nearly at equal distances as possible from the side lines, and the north fork should have crossed the middle of the first line, half a mile on a direct course from the lower part of the mouth of Mill creek.

Wherefore, it is decreed and ordered, that the said decree of the district court be reversed, and that the appellee do pay unto the appellants their costs in this behalf expended.   And it is further decreed and ordered, that the suit be remanded to the circuit court of Mason county, that it may enter up this decree as the decree of that court, and cause to be ascertained the metes, bounds, and quantity of so much of the survey under which the appellants claim, which, conformably to the foregoing opinion, hath been surveyed according to entry, and which lies within the bounds of the survey of the appellee, and decree the same to the appellants; and also that it make such other and further decrees and orders therein as law and equity may require, which is ordered to be certified to the circuit court for Mason county.